FILED

09/16/2022

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 13, 2022

## STATE OF TENNESSEE v. RYAN BENITO CALDERON SOTELO

**Appeal from the Circuit Court for Maury County**
**No. 2019-CR-27828     Stella L. Hargrove, Judge**

_____

### No. M2021-01269-CCA-R3-CD
_____

Defendant, Ryan Benito Calderon Sotelo, was convicted after a jury trial of the sale of twenty-six grams or more of cocaine and subsequently sentenced to twelve years in confinement. On appeal, Defendant argues that the evidence was insufficient to support his conviction and that his sentence is excessive. After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and KYLE A. HIXSON, JJ., joined.

William C. Barnes, Jr., Columbia, Tennessee, for the appellant, Ryan Benito Calderon Sotelo.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Senior Assistant Attorney General; Brent A. Cooper, District Attorney General; and Jonathan W. Davis, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural History

This case arises from a July 12, 2018 controlled drug transaction conducted in Spring Hill. The Maury County Grand Jury subsequently indicted[1] Defendant for the sale of twenty-six grams or more of cocaine, a Class B felony. *See* Tenn. Code Ann. §§ 39-17-408(b)(4), -417(a)(3), (c)(1) (2018).

At trial, the "criminal informant" (CI) testified that he had previously been charged in Georgia with driving under the influence, domestic violence, and possession of a firearm. When the CI lived in Georgia, he met police officers while working at a restaurant; an officer asked the CI to work as an informant because the CI spoke Spanish, and the CI agreed. After the CI moved to Tennessee, he continued working as a CI with Tennessee police. The CI stated that the police paid him well and that he made more money as a CI than he did working in the restaurant. The CI was trained by the police to purchase drugs, including the "language" and the "clues" of drug transactions.

The CI testified that on the morning of July 12, 2018, he bought drugs from Defendant. He noted that he had previously purchased drugs from Defendant's "boss." The CI met with Tennessee Bureau of Investigation (TBI) agents an hour before the sale, during which the agents searched the CI and his car and gave him $3,200 with which to buy three ounces of cocaine. They also gave the CI two cameras disguised as a cell phone charger and a cell phone with which to record the transaction. The CI drove his car to meet Defendant at the parking lot of a McDonald's restaurant.

The CI testified that during the transaction, he told Defendant to count the money; however, Defendant did not count the money because an unrelated police officer stopped nearby distracted him. The CI noted that Defendant called him after the transaction because the payment was $400 short. The CI identified Defendant in the courtroom as the person from whom he bought the cocaine. After the transaction, the CI returned to the TBI agents and gave them the cocaine, and the agents searched the CI and his car and took back the two cameras.

On cross-examination, the CI denied having had any legal problems except the Georgia charges. He affirmed that he was paid per transaction depending upon the weight of the drugs purchased and that he was paid about $600 in this case. In addition to being a CI, the CI also worked at a restaurant. He denied ever having used illegal drugs. The CI agreed that he had to obtain information from people "who deal with this type of substance" in order to make the purchases. When asked whether he was in the country legally, the CI

---

[1] The indictment originally consisted of three counts. Counts 1 and 2 of the indictment were for facilitation of sale or delivery of cocaine and were dismissed by the State on the day of trial. The indictment and Defendant's presentence report reflect that Counts 1 and 2 related to Defendant's arranging two separate drug sales for Moises Silva, whose case was joined with Defendant's. Co-defendant Silva entered a guilty plea before trial.

responded that he was "in the process" but that he was an undocumented immigrant at the time of trial.

Former TBI Special Agent Lazaro Serna testified that he worked for the TBI between 2017 and 2019, during which time he received TBI and federal Drug Enforcement Administration training about how to work drug cases, including using CIs. Mr. Serna was assigned to work with the CI, and the two men primarily communicated in Spanish.

Mr. Serna testified that on July 12, 2018, he met with the CI, instructed him where to meet Defendant and how much cocaine to buy, and gave him cash for the transaction and the two cameras. Mr. Serna noted that he miscounted the money and gave the CI $3,200 rather than the agreed-upon $3,600. Mr. Serna stated that the cash was photographed and the serial numbers recorded. Mr. Serna searched the CI and his car to ensure that he did not have additional cash, drugs, or a gun, and no such items were found. During the drug buy, Mr. Serna listened to the transaction via a live audio feed and visually surveilled the CI's car.

Two video recordings were received as evidence and played for the jury. The first recording showed the ceiling and windshield of a car; the camera was in the center console facing upward toward the front passenger seat. A young Hispanic man, who was later identified as Defendant, entered the car. After a brief conversation in Spanish, another person handed him money, and Defendant left the car shortly thereafter. Defendant could be seen very briefly handing the other person a white object. A still photograph of Defendant's face and his accepting the cash was entered as an exhibit.

The second recording reflected the same transaction from a different angle. The camera was located near the center console facing into the car and showed portions of the front driver's-side and passenger seats. The driver's and passenger's faces were not visible from this angle. The passenger could be seen placing a bag of white powder in a cup holder in the console. A still photograph of the passenger's hand placing the bag in the cup holder was entered as an exhibit.

Mr. Serna testified that he saw a black Ford Fusion with black rims pull up to the CI's car and that Defendant exited the Ford before entering the CI's front passenger seat. Mr. Serna noted that a Spring Hill police cruiser was coincidentally in the McDonald's parking lot and that the CI and Defendant discussed it because it made Defendant nervous. After the transaction, Defendant returned to his vehicle and left; Mr. Serna followed the CI, and other officers followed Defendant. The CI drove to a predetermined meeting place, where Mr. Serna and another agent retrieved a "pretty big bag" of cocaine and searched the CI and his car; no additional drugs or money were found. Mr. Serna testified that, in his experience, a typical powder cocaine user would use about one-tenth of one gram at a time.

On cross-examination, Mr. Serna acknowledged that although it would have been unusual for a person to purchase three ounces of cocaine for personal use, it was possible. Mr. Serna denied knowing that the CI was an undocumented immigrant, and he noted that it was "up to the agency to determine" whether the agents would work with a person similarly situated to the CI. Mr. Serna opined that he would not personally choose to work with an undocumented immigrant. Mr. Serna stated that the TBI performed background checks on CIs. Mr. Serna did not recall how much the CI was paid for the relevant drug buy.

Maury County Sheriff's Department Deputy and 22nd Judicial Drug Task Force Director, William Doelle, testified that he assisted with surveillance for the July 12, 2018 drug buy, including following Defendant's car after he left the McDonald's parking lot. Deputy Doelle testified that he had forty years of law enforcement experience, thirty-two of which were in the "drug unit." Deputy Doelle stated that at the time of the transaction, the officers did not have "live-feed" video cameras or audio, although they observed the vehicles.

Deputy Doelle generally described how officers interacted with a CI before and after a controlled drug buy, including searching the CI and the CI's vehicle. He opined that CIs were a "necessary ev[i]l" and that CIs typically had a criminal record, although some did not. Deputy Doelle stated that CIs were not trustworthy and that police used "surveillance and scrutiny" to verify the information CIs gave them. Deputy Doelle stated that a typical cocaine user would use one or two-tenths of a gram at a time.

On cross-examination, Deputy Doelle testified that he had met the CI about three times and that if he had known the CI had entered the country illegally, he would not have worked with him. Deputy Doelle affirmed that although the cash for the drug buy was photographed before the transaction, Mr. Serna accidentally gave the CI $3,200 instead of $3,600. He did not know how the error occurred.

TBI Special Agent Glen Glenn, an expert in forensic chemistry, testified that he tested the white substance collected by Mr. Serna from the CI and identified it as cocaine. The cocaine weighed 82.27 grams.

On cross-examination, Agent Glenn testified that he did not perform a "purity test" on the cocaine. He stated that cocaine was commonly "cut" with other substances and that "it appear[ed]" that one of those substances was "present in a proportionally small amount," although he had not collected data to identify the substance.

Based upon this evidence, the jury convicted Defendant as charged. At the sentencing hearing, Tennessee Department of Correction Probation/Parole Officer Monique Wells testified that she composed Defendant's presentence report and a

supplemental report. Defendant had the following prior convictions: in Rutherford County, two counts of misdemeanor assault committed in September 2020; in Davidson County, one count of aggravated criminal trespass[2] committed in December 2017; in Dickson County, possession of drugs committed in September 2017, and two traffic offenses and misdemeanor theft, all committed in August 2017. Officer Wells noted that the 2020 assaults occurred while Defendant was released on bond in this case.

According to the presentence report, Defendant declined to give Officer Wells a statement about the offense. Defendant stated that he dropped out of high school at age seventeen to work more and subsequently earned a GED. When Defendant was sixteen, his father admitted him for inpatient psychiatric treatment because Defendant made suicidal comments after Defendant's cousin passed away. Defendant reported that he was told he had an "imbalance" causing depression and was prescribed medication that he never took. Defendant reported that he started drinking alcohol occasionally at age fifteen and smoking marijuana about once per month at age seventeen. He also admitted having "tried" Xanax and cocaine. Defendant stated that he had used cocaine two or three times and that he used Xanax once or twice per year. Defendant had completed a drug and alcohol class previously as a condition of probation.

Officer Wells testified that the District Attorney General's Office subsequently provided her with additional information about Defendant's criminal history, which consisted of a bench warrant issued in Brown County, Nebraska. The warrant alleged that on September 15, 2019, Defendant committed felony possession of more than one pound of marijuana, as well as felony "manufacture, possession, controlled substance, Schedule I, II, III." To Officer Wells' knowledge, the warrant had not been "satisfied."

The trial court remarked that Defendant was also on probation for the 2017 misdemeanor theft conviction when he committed the offense in this case. Upon examination by the trial court, Officer Wells affirmed that she was unable to verify Defendant's self-reported mental health information, education, and work history. Officer Wells agreed that the Strong R assessment rated Defendant a medium risk to reoffend. She stated that Defendant had no behavioral infractions in jail.

---

[2] The presentence report reflected that the original charge was for felony theft of property valued between $10,000 and $60,000.

Defendant testified that he was twenty-three[3] years old, that he had been in a relationship with his girlfriend for three years, and that they had three[4] children together, the youngest of whom was eight days old at the time of the sentencing hearing. Defendant stated that he felt guilty for not being able to be there for his newborn due to his incarceration. Defendant's other children were two years old and one year old, respectively. Defendant stated that this was the first time he had experienced "lengthy jail time" and that he had not been able to help his family. He said that he began selling narcotics to support his cocaine use, which occurred before he had children. Defendant stated that he used three grams of cocaine daily, which cost between $200 and $250. Defendant averred that he was drug-free in jail and that he had no intention of using cocaine again. Defendant testified that when he was released from prison, he intended to work for his father, who was a manager at a McDonald's restaurant, to take care of his family.

On cross-examination, Defendant testified that at the time of his trial, he had been living in Murfreesboro with his girlfriend for about two years. Before that, he lived in South Dakota for between eighteen months and two years until he was extradited to Tennessee on the present charge. After Defendant was released on bond, he worked for a restaurant and a UPS distribution center; he quit the latter job in January 2021 and had not worked since. Defendant collected unemployment benefits in the interim.

Defendant acknowledged that he was released on bond when the 2020 Rutherford County assault incident occurred; he said that he pleaded guilty to two counts of assault and received concurrent six-month sentences. Defendant also served an eleven-month, twenty-nine-day probationary sentence beginning on January 2, 2018, for aggravated criminal trespass in Davidson County, which was negotiated down from felony theft. Defendant also pled guilty to possession of marijuana and misdemeanor theft in Dickson County and was sentenced to eleven months, twenty-nine days of probation beginning on January 18, 2018. He agreed that he reported to different probation officers in the two counties.

Relative to the warrants in Nebraska, Defendant testified that he posted bond, that he was extradited to Tennessee in this case, and that the Nebraska charges were still pending. He acknowledged that the State of Nebraska alleged in the warrant that police found about two pounds of marijuana in the trunk of a car in which Defendant and two other people were traveling. Defense counsel asked Defendant whether he was driving, and Defendant answered affirmatively; however, defense counsel later stated that Defendant was a passenger, and Defendant indicated his assent to that statement.

---

[3] The presentence report reflected that Defendant had recently turned twenty-four at the time of the sentencing hearing.

[4] Defendant noted that his girlfriend's oldest child had a different biological father, but that Defendant considered the child to be his notwithstanding the child's paternity.

Defendant stated that at the time he was stopped in Nebraska, he also had pending charges for driving with a suspended license and a violation of probation related to his theft conviction. Defendant stated that after he was extradited to Tennessee, he posted bond and "turned [him]self in" in Hickman County and Dickson County.

Upon examination by the trial court, Defendant testified that he was on probation at the time of the cocaine sale in this case. When asked why he was "all over the place," Defendant explained that he previously lived in Columbia, Hickman County, Dickson County, and Nashville. He stated that when he was stopped in Nebraska, he was driving from South Dakota to Denver, Colorado and that the marijuana belonged to one of the other people in the car.

Defendant testified that he could not support his cocaine habit with legal income and had to sell drugs. He estimated that he had been sober since "[a]t least 2019," and he denied obtaining drugs in the Maury County Jail. Defendant averred that he would pass a drug screen if tested that day. Defendant affirmed that the criminal history recited at the sentencing hearing sounded correct. He stated that he paid $400 cash bail in Nebraska. Defendant stated that his father was general manager at a McDonald's and that Defendant's longest period of employment was four years at a Nashville McDonald's.

Defendant testified that his oldest child was born in October 2018; he acknowledged that the alleged Nebraska offense occurred in September 2019. Defendant stated that his child was with his girlfriend at the time of his arrest.

The trial court stated that it considered the evidence presented at trial and the sentencing hearing, the presentence report, sentencing alternatives, the principles of sentencing, the nature and characteristics of the offense, enhancement and mitigating factors, statistical information on sentencing, and Defendant's potential for rehabilitation and treatment. The court noted that it was bound not to impose a greater sentence than was needed to deter this type of criminal conduct.

The trial court found that although defense counsel had raised the possibility of community corrections, the court did not believe it was appropriate. The court found that Defendant was not eligible for probation. Relative to the circumstances of the offense, the court noted Deputy Doelle's testimony about the use of CIs and his forty years of law enforcement experience, as well as the video-recorded evidence. The court found that Defendant confirmed his criminal history as listed in the presentence report and that Defendant had "some issues" related to education and his health. The court stated that it was required to "talk about" the Strong R assessment but that the court did not consider the assessment to be trustworthy because it was based mostly upon self-reporting.

Relative to Defendant's criminal history, the trial court found that Defendant had been placed on probation "many times in many locations" and that, in one case, he pleaded guilty to a misdemeanor when he had been charged with a felony. The court noted that Defendant had accumulated new charges when he was on probation or released on bond. The court expressed concern about Defendant's "inability to stay clean and not commit crimes," and it found that society needed to be protected from a person who "ha[d] 82 grams of cocaine that [was] available to anybody that ha[d] the money." The court also noted its concern with providing an effective deterrent to others likely to sell cocaine in Maury County. The court found that Defendant had failed to take responsibility for his conduct. The court noted that although Defendant testified at the hearing that he had no children at the time of the offense, he did have at least one child when he was indicted for felony offenses in Nebraska.

The trial court found that Defendant was a Range I, standard offender and that the sentencing range was eight to twelve years. The court found that no mitigating factors applied and that none were requested. Relative to enhancement factors, the court found that Defendant had a history of criminal behavior and convictions in addition to those necessary to establish his sentencing range. The court stated that it gave enhancement factor (1) "great weight." The court noted that although Defendant had been "really lucky" to only have a misdemeanor record, he was "fast building" a felony record in Tennessee and Nebraska. The court also applied enhancement factor (8), that Defendant had failed to comply with the terms of previous release in the community and gave it great weight. The court noted that Defendant was on probation and released on bond at the time of the offense in this case. The court imposed a twelve-year sentence.

Defendant subsequently filed a motion for new trial, arguing that the "weight of the evidence predominate[d] against the verdict" and that his sentence was excessive. The trial court denied the motion following a hearing, and Defendant timely appealed.

## Analysis

### I. Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to sustain his conviction. The State responds that Defendant has waived this issue for failure to adequately brief it; in the alternative, the State argues that the evidence was sufficient.

As a preliminary matter, this section of Defendant's appellate brief does not allege why the evidence was insufficient to support a guilty verdict or cite to the trial record in support of such an argument. *See* Tenn. R. App. P. 27(a)(7) (requiring that an appellate brief contain an argument with "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require

appellate relief, with citations to the authorities and appropriate references to the record[.]"). "Issues unsupported by argument . . . or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). However, due to the seriousness of Defendant's Class B felony conviction, we choose to review the sufficiency of the evidence notwithstanding the waiver.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

Viewing the evidence in the light most favorable to the State, the evidence was sufficient for a rational juror to find that Defendant sold more than twenty-six grams of cocaine during the controlled drug buy. The CI's testimony about the exchange of money and cocaine was corroborated by the video recordings, which clearly showed Defendant's face as he placed the bag of cocaine in the CI's cup holder and accepted money from the CI. Mr. Serna provided further corroboration, including that the CI possessed no drugs before he met with Defendant and that Defendant was the person who entered the CI's car. Subsequent TBI testing confirmed that the substance was 82.27 grams of cocaine. The evidence is sufficient to support Defendant's conviction, and he is not entitled to relief on this basis.

## II. Sentencing

Defendant contends that his twelve-year sentence is excessive, arguing that the trial court should have imposed a minimum in-range sentence of eight years. The State responds that the trial court acted within its discretion in imposing the maximum in-range sentence.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2020).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2020); *State v. Bise*, 380 S.W.3d at 682, 706 (Tenn. 2012). Although the trial court should consider enhancement and mitigating factors, such factors are advisory only. *See* Tenn. Code Ann. § 40-35-114 (2020); *see also Bise*, 380 S.W.3d at 698 n. 33, 704; *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

When the record clearly establishes that the trial court imposed a sentence within the appropriate range after a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *Bise*, 380 S.W.3d at 707. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2020), Sentencing Comm'n Cmts.

Here, the trial court selected a within-range sentence, detailed its findings on the record, and its decision is presumptively reasonable. *Bise*, 380 S.W.3d at 707. The trial court determined that Defendant was a Range I standard offender. The sale of twenty-six grams or more of cocaine is a Class B felony and has a sentencing range from eight to

twelve years.  Tenn. Code Ann. §§ 39-17-408(b)(4), -417(a)(3), (c)(1) (2018); 40-35-112(a)(2) (2021).

After considering the appropriate factors, the trial court ordered a maximum in-range sentence based upon two enhancement factors, Defendant's history of criminal convictions and behavior and his previous failure to comply with the conditions of release into the community, including having been on probation when he committed the offense in this case and committing further offenses while released on bond in this case.  The court also found that a sentence in confinement was necessary to protect the public from Defendant's criminal behavior and deter similarly-situated individuals.  As the State notes, other than describing the sentence as "harsh" and "unjust," Defendant does not dispute any of the court's specific sentencing findings, and the court's imposition of a maximum in-range sentence is supported by the record.  The court did not abuse its discretion, and Defendant is not entitled to relief on this basis.

## Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE